## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

| | | |
|---|---|---|
| JANE DOE (A.S.) | &#124; | |
|        Plaintiff | &#124; | Civil Action No:_____ |
| V. | &#124; | |
| | &#124; | |
| WYNDHAM HOTELS AND RESORTS; | &#124; | |
| CPLG, TX PROPERTIES, LLC; BRE/LQ | &#124; | |
| TXGP, LLC; PRISTINE HOSPITALITY, | &#124; | COMPLAINT |
| INC.; VIJAYALAKSHMI, LP; TRINTY | &#124; | |
| LODGING, LLC; CHOICE HOTEL | &#124; | |
| INTERNATIONAL, INC.; INN OF THE | &#124; | |
| WEST LLC; GURKARN DIAMOND | &#124; | |
| HOTEL CORPORATION; CAPTIAL | &#124; | JURY TRIAL DEMAND |
| SPRING SBLC, LLC; WEST TEXAS | &#124; | |
| HOTEL GROUP LLC; NIYATI 01 LLC | &#124; | |
| RED LION HOTELS CORPORATION | &#124; | |
| (RLH); BANKHEADS HOTELS, LLC | &#124; | |

### PLAINITFF'S ORIGINAL COMPLAINT

Jane Doe A.S., Plaintiff in the above-styled and numbered cause, files this

Original Complaint against WYNDHAM HOTELS AND RESORTS, CHOICE HOTEL

INTERNATIONAL, RED LION HOTEL (RLH), Franchisor and CPLG TX PROPERTIES;

BRE/LQ TXGP, LLC; PRESTINE HOSPITALITY, INC.; VIJAYALAKSHMI, LP; TRINTY

LODGING, LLC; INN OF THE WEST LLC; GURKARN DIAMOND HOTEL

CORPORATION; CAPITAL SPRING SBLC, LLC; WEST TEXAS HOTEL GROUP LLC;

NIYATI 01, LLC; BANKHEADS HOTELS, LLC; Franchisee as Defendants and respectfully

shows the Court as follows:

## SUMMARY

1.      Jane Doe A.S. files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel victims to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

6.      Jane Doe A.S. alleges that Defendants derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit victims, including Jane Doe

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

A.S., with minimal risk of detection or interruption. Jane Doe A.S. further alleges that Defendants continued providing support for traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

7.      Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe A.S. experienced as the result of continuous sexual exploitation. Defendants failed to do so. Instead, Defendants benefited from facilitating that sex trafficking. Accordingly, Jane Doe A.S. files this lawsuit.

## PARTIES

### I.  Plaintiff, Jane Doe A.S.

8.      Plaintiff, Jane Doe A.S. is a resident of Fort Worth, Texas. She may be contacted through her lead counsel, whose information is contained below.

9.      Jane Doe A.S. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

10.     The trafficking of Jane Doe A.S. occurred in or affected interstate commerce.

11.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe A.S.

### II.  Franchisor Defendant, Wyndham Hotels and Resorts

12.     Wyndham Hotels and Resorts is a for-profit Delaware corporation with its principal place of business in New Jersey.

13.     All references to Wyndham Hotels and Resorts include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Wyndham Hotels and Resorts now or at any time relevant to the claims herein.

14.     Wyndham Hotels and Resorts may be served through its registered agent for service: **Corporate Creations Network, Inc., 3411 Silverside Road Tatnall Building – Suite No. 104, Wilmington, Delaware 19810**.

**III.     Franchisee Defendant, CPLG TX Properties, LLC**

15.     **CPLG TX Properties,** is a for-profit limited liability company with its principal place of business in Irving, Texas.  At all relevant times, CPLG TX Properties LLC owned, operated, and controlled the La Quinta located at 2307 W. 306 Loop, San Angelo, Texas 76904 and the La Quinta located at 4130 West Wall Avenue, Midland, TX 79703.

16.     All references to **CPLG TX Properties, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Wyndham Hotels and Resorts now or at any time relevant to the claims herein.

17.     **CPLG TX Properties, LLC** may be served through its registered agent for service: **Cogency Global Inc., 1601 Elm Street, Suite 4360, Dallas, Texas 75201.**

**IV.     Defendant, BRE/LQ TXGP, LLC**

18.     **BRE/LQ TXGP, LLC** is a for-profit limited liability company with its principal place of business in Irving, Texas. At all relevant times owned, operated and controlled

the La Quinta located at 2307 W. 306 Loop, San Angelo, Texas 76904 and the La Quinta located at 4130 West Wall Avenue, Midland, TX 79703.

19.     All references to **BRE/LQ TXGP, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Wyndham Hotels and Resorts now or at any time relevant to the claims herein.

20.     **BRE/LQ TXGP, LLC** may be served through its registered agent for service: **Corporation Service Company d/b/a CSC-Lawyers Inco 211 E. 7th St., Suite 620, Austin, TX 78701.**

**V.     Franchisee Defendant, Pristine Hospitality, Inc.**

21.     **Pristine Hospitality, Inc.** is a for-profit corporation with its principal place of business in Odessa, Texas. At all relevant times, **Pristine Hospitality, Inc**. owned, operated, and controlled the La Quinta located at 2606 North Loop 250, Midland, Texas 79707.

22.     All references to **Pristine Hospitality, Inc.,** include any department, division, office, agency, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of **Wyndham Hotels and Resorts** now or at any time relevant to the claims herein.

23.     **Pristine Hospitality, Inc.** may be served through its registered agent for service: **Ashit Singh, 2606 North Loop 250 W., Midland, Texas 79707.**

**VI.     Franchisee Defendant, Vijayalakshmi, LP**

24.     **Vijayalakshmi, LP,** is a for-profit limited partnership with its principal place of business in San Angelo, Texas. At all relevant times, **Vijayalakshmi, LP** owned, operated, and controlled the Days Inn located at 3017 TX-306 Loop, Midland, TX 79703.

25.     All references to **Vijayalakshmi, LP,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Wyndham Hotels and Resorts now or at any time relevant to the claims herein.

26.     **Vijayalakshmi, LP** may be served through its registered agent for service: **Viswanathan Thenappan, 3017 W. Loop 306, San Angelo, TX 76904.**

**VII.     Franchisee Defendant, Trinity Lodging, LLC**

27.     **Trinity Lodging, LLC,** is a for-profit limited liability company with its principal place of business in Arlington, Texas. At all relevant times, **Trinity Lodging, LLC** owned, operated, and controlled the Wingate located at 8650 N. Stemmons Fwy, Dallas, TX 75247.

28.     All references to **Trinity Lodging, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Wyndham Hotels and Resorts now or at any time relevant to the claims herein.

29.     **Trinity Lodging, LLC** may be served through its registered agent for service: **Ketan M Masters, 2601 Oates Ln, Arlington, TX 76006.**

**VIII.     Franchisor Defendant, Choice Hotel International, Inc.**

30.    **Choice Hotel International, Inc.** is a for-profit Delaware corporation with its principal place of business in Maryland.

31.    All references to **Choice Hotel International, Inc.** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Choice Hotel International, Inc. now or at any time relevant to the claims herein.

32.    **Choice Hotel International, Inc.** may be served through its registered agent for service: **United State Corporation Company, 2011 E. 7ᵗʰ Street, Suite 620, Austin, TX 78701**.

**IX.    Franchisee Defendant, Inn of the West LLC**

33.    **Inn of the West LLC** is a for-profit limited liability company with its principal place of business in Las Vegas, Nevada. At all relevant times, **Inn of the West LLC** owned, operated, and controlled the Econo Lodge San Angelo located at 415 W. Beauregard, Midland, TX 79703.

34.    All references to **Inn of the West LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of **Choice Hotel International, Inc**. now or at any time relevant to the claims herein.

35.    **Inn of the West LLC**  may be served through its registered agent for service: **Layne R. Turner, 202 West Twohig Ave., Suite 100, San Angelo, TX 76903.**

**X.    Franchisee Defendant, Gurkarn Diamond Hotel Corporation**

36.     **Gurkarn Diamond Hotel Corporation** is a for-profit corporation with its principal place of business in Fairfield, California. At all relevant times, **Gurkarn Diamond Hotel Corporation** owned, operated, and controlled the Quality Inn located at 4706 N. Garfield Street, Midland, TX 79705.

37.     All references to **Gurkarn Diamond Hotel Corporation,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of **Choice Hotel International, Inc**. now or at any time relevant to the claims herein.

38.     **Gurkarn Diamond Hotel Corporation** may be served through its registered agent for service: **Jaswant Gill, 1601 North B Street, Midland, TX 79701.**

**XI.     Franchisee Defendant, Capital Spring SBLC, LLC**

39.     **Capital Spring SBLC, LLC** is a for-profit limited liability company with its principal place of business in Dallas, Texas. At all relevant times, **Capital Spring SBLC, LLC** owned, operated, and controlled the Quality Inn located at 4613 S. Jackson St., San Angelo, TX 76903.

40.     All references to **Capital Spring SBLC, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of **Choice Hotel International, Inc.** now or at any time relevant to the claims herein.

41.     **Capital Spring SBLC, LLC** may be served through its registered agent for service: **Corporation Service Company d/b/a CSC-Lawyers Incorporated, 211 E. 7th Street, Suite 620, Austin, TX 78701.**

**XII.    Franchisee Defendant, West Texas Hotel Group, LLC**

42.     **West Texas Hotel Group, LLC** is a for-profit limited liability company with its principal place of business in Cameron, Texas. At all relevant times, **West Texas Hotel Group, LLC** owned, operated, and controlled the Quality Inn located at 4613 S. Jackson St., San Angelo, TX 76903.

43.     All references to **West Texas Hotel Group, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of **Choice Hotel International, Inc.** now or at any time relevant to the claims herein.

44.     **West Texas Hotel Group, LLC** may be served through its registered agent for service: **Owner/CEO of West Texas Hotel Group LLC, 1004 East 1st Street, Cameron, TX 76520.**

**XIII.    Franchisee Defendant, Niyati 01, LLC**

45.     **Niyati 01, LLC** is a for-profit limited liability company with its principal place of business in Cameron, Texas. At all relevant times, **Niyati 01, LLC** owned, operated, and controlled the Quality Inn located at 4613 S. Jackson St., San Angelo, TX 76903.

46.     All references to **Niyati 01, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority),

employee, person, firm, or corporation action on behalf of **Choice Hotel International, Inc.** now or at any time relevant to the claims herein.

47.     **Niyati 01, LLC** may be served through its registered agent for service: **Balwantrai H. Patel, 1004 East 1st St., Cameron, TX 76520.**

**XIV.     Franchisor Defendant, Red Lion Hotels Corporation (RLH)**

48.     **Red Lion Hotels Corporation (RLH)** is a for-profit Massachusetts corporation with its principal place of business in New Jersey.

49.     All references to **Red Lion Hotels Corporation (RLH)** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or implied/apparent authority), employee, person, firm, or corporation action on behalf of Red Lion Hotels Corporation (RLH) now or at any time relevant to the claims herein.

50.     **Red Lion Hotels Corporation (RLH)** may be served through its registered agent for service: **Corporation Service Company d/b/a CSC-Lawyers Incorporated, 211 E. 7th Street, Suite 620, Austin, TX 78701**.

**XV.     Franchisee Defendant, Bankheads Hotels, LLC**

51.     **Bankheads Hotels, LLC** is a for-profit limited liability company with its principal place of business in Las Vegas, Nevada. At all relevant times, **Bankheads Hotels, LLC** owned, operated, and controlled the Americas Best Value Inn located at 3610 Bunkhead HWY, Midland, TX 79701.

52.     All references to **Bankheads Hotels, LLC,** include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. These references also include any director, officer, agent (either with direct/actual or

implied/apparent authority), employee, person, firm, or corporation action on behalf of **Red Lion Hotels Corporation (RLH)** now or at any time relevant to the claims herein.

53.    **Bankhead Hotels LLC** may be served through its registered agent for service: **Mahendra Patel, 1003 S. Midkiff Road, Midland, Texas 79701.**

## JURISDICTION AND VENUE

54.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

55.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because this is the Judicial District where a substantial part.

## STATEMENT OF FACTS

XVI.    **Jane Doe** A.S. **was a victim of unlawful sex trafficking at a hotel owned, operated, managed and controlled by Defendants.**

A.    **Jane Doe A.S. Was Trafficked at the Days Inn** located at **3017 TX-306 Loop, Midland, Texas79703.**

1.    Between approximately **May 2013 and June 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **Days Inn** located at **3017 TX-306 Loop, Midland, Texas79703** (hereinafter known as "Days Inn").

2.    Jane Doe's' sexual exploitation occurred repeatedly in rooms of the Days Inn.

3.    At all relevant times, the Days Inn was a hotel branded by Wyndham Hotels and Resorts.

4.      At relevant times, Vijayalakshmi, LP. owned, operated, and managed the Days Inn and employed the staff at the Days Inn through the franchising system of Wyndham Hotels and Resorts.

5.      At all relevant times, Wyndham Hotels and Resorts was directly involved in the relevant operations of the Days Inn and exercised systemic control over Vijayalakshmi, LP. with respect to operation of the Days Inn such that Vijayalakshmi, LP. was Wyndham Hotels and Resorts' actual agent for operation of the Days Inn. Wyndham Hotels and Resorts also retained control over aspects of the operations of the Days Inn directly related to the claims of Jane Doe A.S.

6.      The traffickers of Jane Doe A.S. and other sex traffickers frequently used Days Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Days Inn.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at Days Inn such that Wyndham Hotels and Resorts and Vijayalakshmi, LP. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the Days Inn included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the car used to transport her there would be parked in a spot where the license plate was not visible, the do not disturb sign was constantly on the door to the room being used and there was a constant heavy foot traffic in and out of her room

involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**B.      Jane Doe A.S. Was Trafficked at the Econo Lodge** located at **415 W. Beauregard, Midland, Texas 79703.**

1.      Between approximately **May 2013 and July 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **Econo Lodge** located at **415 W. Beauregard, Midland, Texas 79703** (hereinafter known as "Econo Lodge").

2.      Jane Doe's' sexual exploitation occurred repeatedly in rooms of the Econo Lodge.

3.      At all relevant times, the Econo Lodge was a hotel branded by Choice Hotels International Inc..

4.      At relevant times, Inn of the West LLC. owned, operated, and managed the Econo Lodge and employed the staff at the Econo Lodge through the franchising system of Choice Hotels International Inc.

5.      At all relevant times, Choice Hotels International Inc. was directly involved in the relevant operations of the Econo Lodge and exercised systemic control over Inn of the West LLC. with respect to operation of the Econo Lodge such that Inn of the West LLC. was Choice Hotels International Inc.'s actual agent for operation of the Econo Lodge. Choice Hotels International Inc. also retained control over aspects of the operations of the Econo Lodge directly related to the claims of Jane Doe A.S.

6.      The traffickers of Jane Doe A.S. and other sex traffickers frequently used Econo Lodge for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Econo Lodge.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at Econo Lodge such that Choice Hotels International Inc. and Inn of the West LLC. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the Econo Lodge included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, , the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**C.      Jane Doe A.S. Was Trafficked at the LaQuinta** located at **2606 North, North Loop 250, Midland, Texas 79707.**

1.      Between approximately **March 2013 and July 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **LaQuinta** located at **2606 North, North Loop 250, Midland, Texas 79707** (hereinafter known as "LaQuinta").

2.      Jane Doe's' sexual exploitation occurred repeatedly in rooms of the LaQuinta.

3.      At all relevant times, the LaQuinta was a hotel branded by Wyndham Hotels and Resorts.

4.      At relevant times, Pristine Hospitality, Inc. owned, operated, and managed the LaQuinta and employed the staff at the LaQuinta through the franchising system of Wyndham Hotels and Resorts.

5.      At all relevant times, Wyndham Hotels and Resorts was directly involved in the relevant operations of the LaQuinta and exercised systemic control over Pristine Hospitality, Inc. with respect to operation of the LaQuinta such that Pristine Hospitality, Inc. was Wyndham Hotels and Resorts' actual agent for operation of the LaQuinta. Wyndham Hotels and Resorts also retained control over aspects of the operations of the LaQuinta directly related to the claims of Jane Doe A.S.

6.      The traffickers of Jane Doe A.S. and other sex traffickers frequently used LaQuinta for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of LaQuinta.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at LaQuinta such that Wyndham Hotels and Resorts and Pristine Hospitality, Inc. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the LaQuinta included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, , the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**D.      Jane Doe A.S. Was Trafficked at the LaQuinta** located at **2307 W 306 Loop, San Angelo, Texas 76904.**

1.     Between approximately **January 2013 and December 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **LaQuinta** located at **2307 W 306 Loop, San Angelo, Texas 76904** (hereinafter known as "LaQuinta").

2.     Jane Doe's' sexual exploitation occurred repeatedly in rooms of the LaQuinta.

3.     At all relevant times, the LaQuinta was a hotel branded by Wyndham Hotels and Resorts.

4.     At relevant times, CPLG TX Properties, LLC. owned, operated, and managed the LaQuinta and employed the staff at the LaQuinta through the franchising system of Wyndham Hotels and Resorts.

5.     At all relevant times, Wyndham Hotels and Resorts was directly involved in the relevant operations of the LaQuinta and exercised systemic control over CPLG TX Properties, LLC. with respect to operation of the LaQuinta such that CPLG TX Properties, LLC. was Wyndham Hotels and Resorts' actual agent for operation of the LaQuinta. Wyndham Hotels and Resorts also retained control over aspects of the operations of the LaQuinta directly related to the claims of Jane Doe A.S.

6.     The traffickers of Jane Doe A.S. and other sex traffickers frequently used LaQuinta for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of LaQuinta.

7.     There were obvious signs that Jane Doe A.S. was being trafficked at LaQuinta such that Wyndham Hotels and Resorts and CPLG TX Properties, LLC. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the LaQuinta included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the car used to transport her there would be parked in a spot where the license plate was not visible, the do not disturb sign was constantly on the door to the room being used and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**E.      Jane Doe A.S. Was Trafficked at the Quality Inn** located at **4706 N. Garfield St, Midland, Texas 79705.**

1.      Between approximately **May 2013 and July 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **Quality Inn** located at **4706 N. Garfield St, Midland, Texas 79705** (hereinafter known as "Quality Inn").

2.      Jane Doe's' sexual exploitation occurred repeatedly in rooms of the Quality Inn.

3.      At all relevant times, the Quality Inn was a hotel branded by Choice Hotels International Inc.

4.      At relevant times, Gurkarn Diamond Hotel Corporation owned, operated, and managed the Quality Inn and employed the staff at the Quality Inn through the franchising system of Choice Hotels International Inc.

5.      At all relevant times, Choice Hotels International Inc. was directly involved in the relevant operations of the Quality Inn and exercised systemic control over Gurkarn Diamond Hotel Corporation with respect to operation of the Quality Inn such that Gurkarn Diamond Hotel Corporation was Choice Hotels International Inc.'s actual agent for

operation of the Quality Inn. Choice Hotels International Inc. also retained control over aspects of the operations of the Quality Inn directly related to the claims of Jane Doe A.S.

6.     The traffickers of Jane Doe A.S. and other sex traffickers frequently used Quality Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Quality Inn.

7.     There were obvious signs that Jane Doe A.S. was being trafficked at Quality Inn such that Choice Hotels International Inc. and Gurkarn Diamond Hotel Corporation knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.     Some of the obvious signs of Jane Doe A.S.'s trafficking at the Quality Inn included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, , the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**F.     Jane Doe A.S. Was Trafficked at the Quality Inn** located at **4613 S. Jackson ST, San Angelo, Texas 76903.**

1.     Between approximately **May 2013 and July 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **Quality Inn** located at **4613 S. Jackson ST, San Angelo, Texas 76903** (hereinafter known as "Quality Inn").

2.     Jane Doe's' sexual exploitation occurred repeatedly in rooms of the Quality Inn.

3.      At all relevant times, the Quality Inn was a hotel branded by Choice Hotels International Inc.

4.      At relevant times, Niyati 01, LLC. owned, operated, and managed the Quality Inn and employed the staff at the Quality Inn through the franchising system of Choice Hotels International Inc.

5.      At all relevant times, Choice Hotels International Inc. was directly involved in the relevant operations of the Quality Inn and exercised systemic control over Niyati 01, LLC. with respect to operation of the Quality Inn such that Niyati 01, LLC. was Choice Hotels International Inc.'s actual agent for operation of the Quality Inn. Choice Hotels International Inc. also retained control over aspects of the operations of the Quality Inn directly related to the claims of Jane Doe A.S.

6.      The traffickers of Jane Doe A.S. and other sex traffickers frequently used Quality Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Quality Inn.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at Quality Inn such that Choice Hotels International Inc. and Niyati 01, LLC. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the Quality Inn included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, , the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was

not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**G.     Jane Doe A.S. Was Trafficked at the Rodeway Inn** located at **306 Loop San Angelo, Texas 76903.**

1.     Between approximately **May 2013 and July 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **Rodeway Inn** located at **306 Loop San Angelo, Texas 76903.** (hereinafter known as "Rodeway Inn").

2.     Jane Doe's' sexual exploitation occurred repeatedly in rooms of the Rodeway Inn.

3.     At all relevant times, the Rodeway Inn was a hotel branded by Choice Hotels International Inc..

4.     At relevant times, Benchmark Hotel of San Angelo, LP. owned, operated, and managed the Rodeway Inn and employed the staff at the Rodeway Inn through the franchising system of Choice Hotels International Inc.

5.     At all relevant times, Choice Hotels International Inc. was directly involved in the relevant operations of the Rodeway Inn and exercised systemic control over Benchmark Hotel of San Angelo, LP. with respect to operation of the Rodeway Inn such that Benchmark Hotel of San Angelo, LP. was Choice Hotels International Inc.'s actual agent for operation of the Rodeway Inn. Choice Hotels International Inc. also retained control over aspects of the operations of the Rodeway Inn directly related to the claims of Jane Doe A.S.

6.      The traffickers of Jane Doe A.S. and other sex traffickers frequently used Rodeway Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Rodeway Inn.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at Rodeway Inn such that Choice Hotels International Inc. and Benchmark Hotel of San Angelo, LP. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8       Some of the obvious signs of Jane Doe A.S.'s trafficking at the Rodeway Inn included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, , the do not disturb sign was constantly on the door to the room being used, there were multiple requests for sheets and towels but hotel staff was not allowed in the room and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**H.      Jane Doe A.S. Was Trafficked at the American Best Value Inn** located at **3610 Bankhead Highway, Midland, Texas 79701**

1.      Between approximately **May 2013 and December 2013**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **American Best Value Inn** located at **3610 Bankhead Highway, Midland, Texas 79701** (hereinafter known as "Americas Best Value Inn").

2.      Jane Doe's' sexual exploitation occurred repeatedly in rooms of the American Best Value Inn.

3.      At all relevant times, the American Best Value Inn was a hotel branded by Red Lion Hotel Corp.

4.      At relevant times, Bankhead Hotels, LLC. owned, operated, and managed the American Best Value Inn and employed the staff at the American Best Value Inn through the franchising system of Red Lion Hotel Corp.

5.      At all relevant times, Red Lion Hotel Corp. was directly involved in the relevant operations of the American Best Value Inn and exercised systemic control over Bankhead Hotels, LLC. with respect to operation of the American Best Value Inn such that Bankhead Hotels, LLC. was Red Lion Hotel Corp.'s actual agent for operation of the American Best Value Inn. Red Lion Hotel Corp. also retained control over aspects of the operations of the American Best Value Inn directly related to the claims of Jane Doe A.S.

6.      The traffickers of Jane Doe A.S. and other sex traffickers frequently used American Best Value Inn for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of American Best Value Inn.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at American Best Value Inn such that Red Lion Hotel Corp. and Bankhead Hotels, LLC. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the America Best Value Inn included the fact that she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, there was a constant heavy foot traffic in

and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

**I.**    **Jane Doe A.S. Was Trafficked at the Wingate Hotel** located at **8650 N Stemmons FWY, Dallas, Texas 75247.**

1.     Between approximately **January 2015 and December 2015**, Jane Doe A.S. was trafficked by her Trafficker "Wendy" at the **Wingate Hotel** located at **8650 N Stemmons FWY, Dallas, Texas 75247** (hereinafter known as "Wingate Hotel").

2.     Jane Doe's' sexual exploitation occurred repeatedly in rooms of the Wingate Hotel.

3.     At all relevant times, the Wingate Hotel was a hotel branded by Wyndham Hotels and Resorts.

4.     At relevant times Trinity Lodging, LLC. owned, operated, and managed the Wingate Hotel and employed the staff at the Wingate Hotel through the franchising system of Wyndham Hotels and Resorts.

5.     At all relevant times, Wyndham Hotels and Resorts was directly involved in the relevant operations of the Wingate Hotel and exercised systemic control over Trinity Lodging, LLC. with respect to operation of the Wingate Hotel such that Trinity Lodging, LLC. was Wyndham Hotels and Resorts' actual agent for operation of the Wingate Hotel. Wyndham Hotels and Resorts also retained control over aspects of the operations of the Wingate Hotel directly related to the claims of Jane Doe A.S.

6.     The traffickers of Jane Doe A.S. and other sex traffickers frequently used Wingate Hotel for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of Wingate Hotel.

7.      There were obvious signs that Jane Doe A.S. was being trafficked at Wingate Hotel such that Wyndham Hotels and Resorts and Trinity Lodging, LLC. knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

8.      Some of the obvious signs of Jane Doe A.S.'s trafficking at the Wingate Hotel included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she would be in the hotel with a group of girls and an older female/male, she had few or no personal items, the car used to transport her there would be parked in a spot where the license plate was not visible, the do not disturb sign was constantly on the door to the room being used and there was a constant heavy foot traffic in and out of her room involving men who were not hotel guests.  These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

59.     The traffickers of Jane Doe A.S. and other sex traffickers frequently used Defendants' Properties for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of said properties.

60.     There were obvious signs that Jane Doe A.S. was being trafficked at Defendants' Properties such that Franchisor Defendants and Franchisee Defendants knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

**XVII.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem**

61.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of Jane Doe A.S. at the Defendants' Properties.

62.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of commercial exploitation of children.[5]

63.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[6]

64.     Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendants were made of aware of, include but are not limited to:

---

[2] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id
[3] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.
[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf
[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).
[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.[7]

65.     Defendants were aware or should have been aware of these signs of sex trafficking when operating controlling, and managing the Defendants' Properties, when enacting and

---

[7] *Id.*

enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of that hotel.

66.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking.

67.     Accordingly, many hotel chains—including Franchisor Defendants' chains—have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels.

68.     Unfortunately for Jane Doe A.S., Franchisor Defendants promises proved empty. Franchisor Defendants have failed, at all levels, to take appropriate action in response to its knowledge regarding human trafficking in its hotels. Instead, Franchisor Defendants have continued financially benefiting from providing a venue for the sexual exploitation of victims like Jane Doe A.S.

## XVIII.   Sex Trafficking Has Long Been Prevalent at Franchisor's Branded Properties, and Franchisor Defendants Have Known It.

69.     Defendants' actual knowledge is *not* limited to general awareness of the problem of sex trafficking in the hotel industry Franchisor Defendants have also known, since well before Jane Doe A.S. was trafficked at the Defendants' Properties, that sex trafficking is endemic in its branded hotels specifically.

70.     Upon information and belief, Franchisor Defendants monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Defendants' Properties.

71.     Countless tales of tragedy, which upon information and belief Franchisor Defendants knows about, establish the entrenched and pervasive nature of Franchisor Defendants' role in providing a venue where sex trafficking has continued, unabated, for years. For example:

72.     Reviews of Franchisor Defendants' branded properties, which upon information and belief Franchisor Defendants monitor regularly, also show the pervasiveness of sex trafficking at its branded properties and Franchisor Defendants' knowledge of the same.

73.     This sampling of news stories and reviews establishes that, at the time Jane Doe A.S. was trafficked at the Defendants' Properties, Franchisor Defendants knew, at least the following:

> a.  The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;
>
> b.  Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;
>
> c.  Its franchisees and hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at its hotel properties;
>
> d.  Its efforts, if any, to stop facilitating sex trafficking in its branded properties were not effective; and

e. It was, by its acts and omissions, facilitating sex trafficking at its branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

74.    Despite the continually mounting evidence that sex trafficking at its properties was ongoing and growing, Franchisor Defendants did not change their course. Franchisor Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

## XIX.    Sex Trafficking Was Prevalent and Obvious at Defendants' Properties

75.    Franchisor Defendants and Franchisee Defendants were also specifically aware that sex trafficking was prevalent at the Defendants' Properties.

76.    Franchisor Defendants and Franchisee Defendants knew that the Defendants' Properties were in a high-crime areas with known histories of reports of sex trafficking.

77.    Online reviews of Defendants' Properties, which upon information and belief were monitored by Franchisor Defendants and Franchisee Defendants, establish the nature of Defendants' Properties 's role as a venue for sex trafficking:

78.    Defendants also knew or should have known about the sex trafficking pervasive at the Defendants' Properties based on first-hand observations. This activity was continuous and obvious. Hotel staff observed this activity and, upon information and belief, Franchisor Defendants and Franchisee Defendants observed this activity through on-site employees, surveillance footage and/or during inspections of the hotel property. Apparent indicia of sex trafficking at Defendants' Properties included:

a. There was a population of traffickers who were known to hotel staff by name. Communication between the hotel staff and traffickers was friendly and reflected an informal agreement or understanding.

b. Traffickers provided staff with bribes and tips to look the other way rather than taking action to prevent sex trafficking.

c. There was a frequent flow of males, who were not guests of the hotel, in and out of rooms after brief stays.

d. There was an area of the hotel that staff informally designated for traffickers, drugs, and prostitution.

e. There was a population of regular traffickers who were known to the staff and who routinely made specific requests, such as requesting rooms next to exit doors, requesting adjoining rooms with those being sexually exploited, and requesting to be in the same area of the hotel as other traffickers.

f. Rooms used by the traffickers were regularly observed to be messy, to contain excessive sex and drug paraphernalia, and to have an unclean smell.

g. The trafficking victims had visible tattoos that indicated "branding" by their traffickers;

79.    The traffickers, including Jane Doe's trafficker, operated with little regard for concealment, due to an implicit understanding between the hotel staff of the Defendants' Properties and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

80.     The open and apparent nature of this trafficking activity is confirmed by the fact that multiple guests noticed the activity and made reports or complaints about the activity. Defendants failed to take reasonable steps in response to these reports or complaints.

## XX.    It was Apparent and Obvious that Jane Doe A.S. was Being Trafficked at Defendants' Properties

81.     During the time that Jane Doe A.S. was trafficked at Defendants' Properties, it was obvious and apparent she was the victim of sex trafficking.

82.     Because it was known among the community of traffickers that staff at the Defendants' Properties turned a blind eye to sex trafficking, Jane Doe's trafficker made little or no effort to disguise his role or his actions.

83.     During interactions with the front desk staff at Defendants' Properties, Jane Doe and her trafficker exhibited obvious and apparent signs of trafficking, including:

   a. Jane Doe did not have access to her identification card, which was controlled by her trafficker. The trafficker would present Jane Doe's identification card when reserving a room in her name;

   b. Jane Doe's trafficker would pay for rooms with cash or prepaid cards;

   c. Jane Doe and her trafficker would stay for an extended period but would pay on a day-to-day basis. Jane Doe's trafficker would escort her on the lobby on a daily basis and require her to pay for the day's rate in cash;

   d. Jane Doe and her traffickers would arrive and book a room for an extended period of time but have little or no luggage with them;

   e. Because Jane Doe's trafficker forbade her from speaking with anyone, Jane Doe would stand off to the side and look down out of fear;

  f. Jane Doe's traffickers provided bribes to hotel staff with an explicit or tacit understanding that the payments were made in exchange for staff to look the other way regarding the trafficking activities;

  g. Jane Doe's trafficker repeatedly made specific requests regarding their rooms, such as requesting that they be located near an exit door, that they be placed in adjoining rooms, or that they be put in an area of the hotel that was known to be used for drugs, prostitution, and trafficking;

  h. Jane Doe's trafficker brought her back to the Defendants' Properties repeatedly, and Jane Doe often encountered the same staff members. These staff members, including management level employees, observed Jane Doe's physical deterioration caused by her trafficker's abuse;

84. While in the common areas of the hotel, Jane Doe exhibited obvious and apparent signs of trafficking that were observed by hotel staff, including:

  a. Jane Doe had limited access to clothing and would be forced to wear clothing that was tattered, inappropriate for the weather, sexually suggestive, and inappropriate for her and age the circumstances;

  b. Jane Doe was prevented from maintaining her hygiene and appearance and would appear unkempt;

  c. Jane Doe appeared malnourished and sleep deprived;

  d. Jane Doe had visible bruises;

  e. Jane Doe had human bite marks visible;

  f. Jane Doe's demeanor showed obvious signs of fear and anxiety;

g.  Jane Doe, who was kept in a drugged state by her traffickers, exhibited obvious signs of disorientation and impairment.

h.  Jane Doe was frequently yelled at by her trafficker in a way that could be heard by customers and staff;

i.  Jane Doe would frequently exit the hotel crying while with her trafficker;

j.  Jane Doe's trafficker was violent with Jane Doe in public areas of the hotel and on the property surrounding the hotel.

k.  Hotel staff saw or heard specific incidents of physical abuse;

l.  Staff received specific complaints or reports about Jane Doe's trafficker;

85.     Hotel staff observed open and apparent signs of activity directly related to the trafficking of Jane Doe:

a.  There was constant and heavy foot traffic in and out of Jane Doe's room involving men who were not hotel guests. Jane Doe had multiple men per day sexually exploiting her at **Defendants' Properties;**

b.  Men sexually exploiting Jane Doe entered and left her room at unusual times and stayed for brief periods;

c.  Men would frequently stop at the front desk asking about the location of Jane Doe or her trafficker;

d.  Jane Doe's trafficker would often wait in the hallway or visibly pace the parking lot while Jane Doe was engaged in commercial sex work;

e.  Jane Doe's trafficker would attempt to prop open the exit door so that customers could enter and exit freely;

    f.   Jane Doe's trafficker would force her to solicit men in the hotel parking lot or lobby, which would be observed by hotel staff;

    g.   Men visiting to sexually exploit Jane Doe would enter and exit the hotel in a manner such that they would be seen by staff working at the front desk;

    h.   Men visiting to sexually exploit Jane Doe would enter and exit the hotel in a manner such that they would be captured by Defendants' surveillance cameras;

    i.   Cars would form a line outside the Defendants' Properties waiting for Jane Doe's services;

86.    Hotel staff observed Jane Doe's room, which showed obvious and apparent signs of sex trafficking:

    a.   Jane Doe's traffickers would decline room service for several consecutive days;

    b.   Jane Does' traffickers would order or require Jane Doe to order additional towels and sheets at varying times of the day or night but housekeeping staff would not be permitted to enter to bring them in and would be asked to leave them at the door;

    c.   Staff would hear sounds of abuse, physical violence, screaming, and crying coming from Jane Doe's room;

    d.   Staff would hear and ignore Jane Doe's desperate screams and pleas for help as she was being physically abused by her trafficker;

    e.   Staff received reports or complaints about noise coming from Jane Doe's room, while staff occasionally asked them to keep the noise down, the staff

neither inquired about Jane Doe's wellbeing nor asked Jane Doe's trafficker to leave;

f. Jane Doe would be confined to her room for excessively long periods without leaving and would have "Do Not Disturb" signs on her door an unusual amount;

g. Hotel staff would enter Jane Doe's room to find it littered with used condoms and other sex paraphernalia left behind.

h. Jane Doe's traffickers would keep excessive amounts of cash in the room;

i. Jane Doe's trafficker would leave obvious signs of illegal drug use in the room for hotel staff to find;

j. Hotel staff entered Jane Doe's room to find her but did not inquire about her wellbeing or take any steps to assist her. Instead, they continued to rent a room to her trafficker;

87.     Jane Doe's trafficker advertised her services on online sites, specifically naming the Defendants' Properties, which Defendants knew or should have, through the exercise of reasonable diligence, known.

88.     Multiple employees at the Defendants' Properties, including management level employees, observed and/or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

## XXI.   Franchisee Defendants Could Have Stopped Jane Doe's Trafficking But, Instead, Facilitated It

89.     Franchisee Defendants are responsible for the acts and omission of all employees of the Defendants' Properties  because these acts and omissions were committed in the scope and

course of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks, known to Franchisee, of human trafficking occurring in the Defendants' Properties .

90.     Franchisee Defendants, including through the staff at Defendants' Properties, had an opportunity to and did observe obvious signs that there was widespread sex trafficking in the Defendants' Properties and, despite this, allowed this activity to continue unabated.

91.     Franchisee Defendants, including through the staff at Defendants' Properties, had an opportunity to and did observe obvious signs that Jane Doe A.S. was being sex trafficked such that Franchisee Defendants had actual knowledge or was reckless in not knowing that Jane Doe was being sex trafficked at the Defendants' Properties . Nonetheless, Franchisee Defendants took no steps in response to these signs and, instead, continued providing assistance to her trafficker.

92.     Franchisee Defendants facilitated Jane Doe's trafficking at the Defendants' Properties  through numerous acts and omission, including:

        a.  Franchisee Defendants allowed traffickers to reserve rooms in Jane Doe's name by showing her identification card in violation of reasonable practices, industry standards, and/or applicable policies;

        b.  Franchisee Defendants allowed traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

        c.  Franchisee Defendants failed to report known or suspected trafficking activity appropriately according to reasonable practices, industry standards, and/or applicable policies;

d.   Despite seeing obvious signs of distress, Franchisee Defendants failed to take any steps to inquire about the welfare of Jane Doe.

e.   Franchisee Defendants continued to rent rooms to traffickers, including Jane Doe's traffickers, despite known or obvious signs of trafficking;

f.   Franchisee Defendants failed to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at Defendants' Properties;

g.   Franchisee Defendants enabled traffickers to access ancillary services that supported trafficking activities, such as providing Wi-Fi access they used to advertise commercial sex services, furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts, and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex.

h.   Franchisee Defendants accommodated specific requests of the trafficker.

i.   Franchisee Defendants accepted bribes or "tips" from the traffickers in exchange for allowing the trafficking activity to occur without interference.

93.    By ignoring or remaining willfully blind to obvious signs of trafficking, Franchisee Defendants assisted traffickers by providing them a venue, with the cover of a legitimate business, where they could conduct their trafficking activities without having to expend significant efforts to avoid detection or interference.

**XXII.   Franchisor Defendants Retained Control Over Relevant Aspects of Operations at Defendants' Properties and Thus Had Both the Opportunity and Duty to Prevent Sex Trafficking at Defendants' Properties , including Jane Doe's Trafficking.**

94.     Franchisor Defendants retained control over the details and methods of aspects of the operation of the Defendants' Properties that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, Franchisor Defendants participated in a venture with sex traffickers who were using the Defendants' Properties as a venue for their trafficking. Moreover, as a result of this retained control, Franchisor Defendants had both the opportunity and the duty to prevent Jane Doe's trafficking.

95.     Franchisor retained control over the training of the staff of Defendants' Properties regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Franchisor Defendants had exercised reasonable diligence in providing training, Franchisor Defendants would have prevented the Defendants' Properties from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe A.S. By failing to take reasonable steps to provide appropriate training, despite the overwhelming evidence it had of an ongoing problem with use of its branded properties for sex trafficking, Franchisor Defendants was negligently facilitating sex trafficking.

96.     Beyond training, Franchisor Defendants also retained control over the response of its hotels to human trafficking, including development of policies and procedure regarding detection of and response to human trafficking. By retaining control in this area, Franchisor Defendants assumed a legal duty to the patrons and guests of its hotels. By failing to exercise reasonable diligence in discharge of this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe, in its hotels.

97.    At the heart of Defendants' venture with traffickers (including Jane Doe's trafficker) is the reservation of hotel rooms. Upon information and belief, Franchisor Defendants retained control over the details of reservations at the Defendants' Properties , including controlling the online reservation system that Franchisee Defendants was required to use, providing software systems Franchisee Defendants  had to use  to check guests in and charge for rooms, controlling the prices of rooms, setting all details of the customer loyalty program that  Franchisee Defendants was required to implement, and setting detailed policies for things such as payment methods and requirements to show identification. Because reservations and payments were processed through its systems, Franchisor Defendants had access to guest and payment information. Franchisor Defendants thus directly participated, through its acts and omissions, in reserving rooms to traffickers, including Jane Doe's traffickers. If Franchisor Defendants had used reasonable diligence in setting, implementing, and enforcing appropriate policies, it would have detected Jane Doe's trafficking and/or prevented Jane Doe's trafficker from using a room to sexually exploit Jane Doe A.S. By failing to exercise reasonable diligence in discharge of this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe, in its hotels.

98.    Specifically, Franchisor Defendants should have known about and prevented Jane Doe's trafficking because Jane Doe's trafficker repeatedly used Jane Doe's identification card to secure rooms in her name and used cash for room purchases, which are recognized sign of sex trafficking. A reasonable policy would not allow someone to secure a room using these tactics. Franchisor Defendants knew that adoption and enforcement of appropriate identification policies and payment-method policies was a crucial tool to avoid use of its hotel properties for trafficking. Franchisor Defendants retained the control to adopt and enforce policies on this subject for its branded properties, including Defendants' Properties but failed to adopt and enforce appropriate

policies, which facilitated trafficking at the Defendants' Properties and allowed Jane Doe's traffickers to access rooms for the purpose of trafficking Jane Doe A.S.

99.    Franchisor Defendants also retained control over issues related to reporting security and criminal activity, including human trafficking activity. On information and belief, Franchisor Defendants adopted a policy that required staff at the Defendants' Properties to report indicators or potential criminal activity on premises to Franchisor Defendants. Based on Franchisor's retained control over this area, it knew or—with reasonable diligence in implementing and enforcing this policy—should have known that Jane Doe A.S. was being trafficked. By failing to exercise reasonable diligence in discharge of this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe, in its hotels.

100.    On information and belief, Franchisor Defendants also retained control over property-specific data and customer data from the Defendants' Properties—which it obtained by controlling the means and methods by which Franchisee Defendants recorded, stored, and reported that data—such that it had actual or constructive knowledge—about the ongoing trafficking that was occurring at the Defendants' Properties during the time Plaintiff was trafficked there. However, on information and belief, Franchisor was willfully blind to this data and continued to facilitate trafficking at the Defendants' Properties by providing a venue—and associated services—where traffickers could profit from sexual exploitation with minimal risk of disruption.

101.    Franchisor also retained control over the security of the Defendants' Properties through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Defendants' Properties. It also collected data regarding hotel operations and customers, including names, payment information, reservation history, browsing data, and other details associated with their stay.

Because Franchisor Defendants retained this control, it had a duty to the patrons and visitors to the Defendants' Properties. If Franchisor Defendants had exercised reasonable care in the discharge of this duty, it would have detected and known about Jane Doe's trafficking- and avoided facilitating it. By failing to exercise reasonable diligence in discharge of this duty, Franchisor Defendants facilitated sex trafficking, including the sex trafficking of Jane Doe, in its hotels.

102.    Franchisor Defendants also retained control over the safety and security of the experience at its branded properties by setting up systems for customers to report issues to Franchisor Defendants rather than Franchisee Defendants. Despite doing this, Franchisor Defendants failed to act reasonably in response to complaints about criminal activity and sex trafficking at its properties, including the Defendants' Properties. If Franchisor Defendants had acted reasonably and prudently in monitoring and responding to customer complaints, it would have reduced the rampant sex trafficking in its branded properties and would not have facilitated Jane Doe's sex trafficking.

103.    Franchisor Defendants required Franchisee Defendants to offer internet service to guests at the Defendants' Properties and retained control over the details of that internet service and policies regarding its use. Upon information and belief, Franchisor Defendants required Franchisee Defendants to use a particular platform, set policies, and retained access to data regarding guests' use of wi-fi. Franchisor Defendants was aware that sex traffickers used the internet to facilitate trafficking by advertising victims' commercial sex services. Because Franchisor Defendants retained control over internet service, Franchisor Defendants could have but did not enact policies to prevent Jane Doe's trafficker from advertising commercial sex activity online and could have, with reasonable diligence, used tools to determine when its hotel and wi-fi were being used to facilitate unlawful sexual exploitation.

104.    Based on public reporting, investigations, criminal incidents, hotel reviews and comments, and direct reporting from Franchisee Defendants, as set out throughout this Complaint, Franchisor Defendants had actual knowledge of pervasive sex trafficking throughout its owned hotel properties generally and specifically at the Defendants' Properties. Franchisor Defendants, through its acts and omissions, knowingly received financial benefit from activity at its branded hotels, including Defendants' Properties, that Franchisor Defendants knew or should have known was unlawful sex trafficking.

105.    If Franchisor Defendants had acted reasonably, in compliance with industry standard, in compliance with its own promises, and/or in compliance with its own policies and procedures, Jane Doe's trafficking would have been prevented.

## XXIII.    Franchisor Defendants Exercised Pervasive Control over Franchisee Defendants, which is therefore Franchisor's Agent.

106.    In addition to Franchisor's direct involvement in the venture through the means outlined above, Franchisor Defendants also participated in the venture through the acts and omissions of Franchisee Defendants, which are Franchisors' actual agents for the purpose of operating the Defendants' Properties.

107.    Upon information and belief, Franchisor Defendants exercised systemic and pervasive control over Franchisee Defendants day-to-day operation of the Defendants' Properties, including the methods and details of Franchisee's work, through ways including:

    a.  controlling and requiring franchisees to use a reservation and marketing system;

    b.  controlling and requiring franchisees to use a credit process system

    c.  dictating policies regarding forms of payment;

    d.  setting prices;

**e.** setting wages;

**f.** making or influencing employment decisions;

**g.** requiring standardized training for hotel employees

**h.** requiring franchisees to collect guest data using Franchisor's systems, to compile reports, and to make that data available to Franchisor.

**i.** requiring Franchisee Defendants to comply with standards, policies, and rules adopted by Franchisor Defendants on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Defendants' Properties .

108.    Franchisor Defendants did not merely identify quality or outcome standards. Instead, it specifically directed the means and methods that Franchisee Defendants and the staff at the Defendants' Properties property should use for day-to-day operations and dictated many of the core tools that Franchisee Defendants was required to use to conduct those operations, including the means and methods of operations that directly caused Jane Doe's damages.

109.    Upon information and belief, Franchisor Defendants had the right to and actually did enforce its control over Franchisee Defendants through various methods including:

a.    Inspections of the Defendants' Properties;

    b.   Monitoring or auditing the Franchisee Defendants for compliance with policies and expectations;

    c.   Directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards;

    d.   Mandating training and education;

    e.   The right to terminate the franchise agreement;

110.    Franchisor Defendants are vicariously liable for the acts and omissions of their agents, Franchisee Defendants, and any sub-agents or employees of Franchisee Defendants with respect to operation of the Defendants' Properties.

## XXIV. Staff of the Defendants' Properties are Joint Employees of both Franchisor Defendants and Franchisee Defendants

111.    In addition, both Franchisor Defendants and Franchisee Defendants participated in the venture through the acts and omissions of the staff at Defendants' Properties because Franchisor Defendants and Franchisee Defendants jointly employ or ratify the employment of staff at Defendants' Properties.

112.    Upon information and belief, Franchisor Defendants exercise control over the terms and conditions of the terms and conditions of employment by:

    a.   Posting jobs for its branded properties

    b.   Providing benefits to staff of its branded properties

    c.   Setting pay, pay parameters, or pay ranges for staff of its branded properties

    d.   Setting job qualifications

    e.   Setting job descriptions

    f.   Dictating staffing levels required at its branded properties

      g.  Making or influencing hiring decisions

      h.  Providing onboarding and ongoing training

      i.  Maintaining employment records, including training records

113.    Franchisor Defendants and Franchisee Defendants act as joint employers because, at the Defendants' Properties, there is a high degree of interrelation of operations and profit sharing.

## XXV.    Defendants Knowingly Benefited From Participation in a Venture They Knew Or Should Have Known Was Engaged In Sex Trafficking

114.    In ways described more fully above, Franchisor Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture with sex traffickers, including Jane Doe's sex trafficker, as follows:

      a.  Sex traffickers, including Jane Doe's sex traffickers, frequently used Defendants' Properties for their trafficking because they knew that staff members would look the other way. This occurred because Franchisor Defendants and Franchisee Defendants (1) failed to adopt and enact policies to effectively detect sex trafficking and stop use of their facilities to facilitate that trafficking;  (2) failed to use reasonable care when hiring, retaining, supervising, and training staff at the Defendants' Properties ; and (3) affirmatively adopted policies and procedures that allowed sex trafficking to flourish.

      b.  Both Franchisor Defendants and Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers. Franchisor Defendants provided "boots on the ground" for reservations, and Franchisor Defendants retained control over reservation systems and applicable policies and guidelines as further described

in this Complaint. They participated in the venture by continuing to rent rooms to Jane Doe's traffickers long after they knew or should have known that Jane Doe was being subjected to unlawful trafficking.

c. Defendants did not only provide these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low-risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

- Staff at the Defendants' Properties knew Jane Doe's traffickers by name or by his "pimp" nickname;

- Jane Doe's traffickers took no steps to conceal their activities from the staff at the Defendants' Properties but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by that staff;

- Despite policies and/or industry standards to the contrary, Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments, not requiring the identification card of the individual actually paying for the room;

d. Both Franchisor Defendants and Franchisee Defendants participated in this venture by providing additional services to traffickers (including Jane Doe's traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

      e.   Defendants' venture with traffickers resulted in revenue from room rentals and other incidental purchases by traffickers, including Jane Doe's trafficker, which accrued to the benefit of both Franchisor Defendants and Franchisee Defendants. Each room rented at Defendants' Properties increased revenue for both Franchisor Defendants and Franchisee Defendants.

115.   Franchisor Defendants also knowingly received a financial benefit by engaging in a venture with Franchisee Defendants operating the Defendants' Properties despite the fact that Franchisor Defendants knew or should have known that Franchisee Defendants was engaged in violation a of 18 U.S.C §1591(a):

      a.   Franchisor Defendants and Franchisee Defendants entered into a venture to operate the Defendants' Properties with the shared objective of maximizing revenue and profits.

      b.   Franchisor Defendants knowingly received a financial benefit from this venture in the form of franchising fees, royalty fees, and other payments from Franchisee Defendants.

      c.   Franchisee Defendants violated 18 U.S.C §1591(a)(1) because, through their management of the Defendants' Properties  and the acts and omissions of the staff of that hotel, Franchisee Defendants harbored trafficking victims and participated in a venture with sex traffickers.

      d.   Franchisor knew, or with the exercise of reasonable diligence, would have known that Franchisee Defendants were engaged in violations of 18 U.S.C §1591(a). Franchisor Defendants should have known about Franchisee's activity at the Defendants' Properties because Franchisor Defendants

retained control over relevant aspects of the operations of Defendants'
Properties and thus owed a corresponding duty. Despite this, Franchisor
Defendants continued to knowingly benefit from its relationship with
Franchisee, including the proceeds Franchisee Defendants obtained from
unlawful sex trafficking. The Franchisor Defendants continued providing
Franchisee Defendants with operational support, use of its trademarks, and
other resources to operate the Defendants' Properties in a way that
Franchisor Defendants knew or should have known was engaging in
violations of 18 U.S.C §1591(a).

## XXVI.    Defendants are Jointly and Severally Liable for Jane Doe's Damages

116.    Under the TVPRA, Defendants are jointly and severally liable for all damages a
jury awards to Jane Doe for past and future losses she suffered as a proximate result of her sexual
exploitation and trafficking.

## CAUSES OF ACTION

## I.    Cause of Action: Franchisee Defendants Violation of §1591(a)(1) of the TVPRA

117.    Jane Doe incorporates all previous allegations.

118.    Jane Doe is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and
is thus entitled to bring a civil action under 18 U.S.C §1595 against any the "perpetrator" of any
violation of the TVPRA.

119.    Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595
because Franchisee Defendants violated 18 U.S.C §1591(a)(1) when, through the acts and
omissions described throughout this Complaint, they harbored individuals (including Jane Doe)
by renting a room to traffickers and providing them with services despite knowing or in reckless

disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Defendants' Properties.

120. Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595 because Franchisee Defendants violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, Franchisee Defendants knowingly received financial benefit by assisting, supporting, or facilitating a venture that Franchisee Defendants knew or was reckless in not knowing engaged in unlawful sex trafficking. Specifically, Franchisee Defendants had an informal, implicit arrangement with sex traffickers, including Jane Doe's sex traffickers, whereby Franchisee Defendants received revenue by renting hotel rooms to these traffickers on an ongoing basis despite knowing, or in reckless disregard of the fact, that these rooms would be used as a venue for sexual exploitation of individuals, including Jane Doe.

121. Franchisee Defendants' violations of 18 U.S.C §1591(a) operated jointly with the other unlawful acts and omissions of Franchisee Defendants and Franchisor Defendants outlined in this Complaint, to cause Jane Doe to suffer substantial physical and psychological injuries and other harm as a result of being trafficked and sexually exploited.

## II. Cause of Action: Franchisee Defendants and Franchisor Defendants' Direct Liability as Beneficiaries under §1595 (a) of the TVPRA

122. Jane Doe incorporates all previous allegations.

123. Jane Doe is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

124.   Through acts and omissions described through this Complaint, Franchisor Defendants and Franchisee Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe's traffickers, despite the fact that Franchisor Defendants and Franchisee Defendants  each knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendants are liable to Jane Doe as beneficiaries under 18 U.S.C §1595.

125.   In addition, through acts and omissions described through this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with Franchisee Defendants to operate the Defendants' Properties  despite the fact that Franchisor Defendants knew or should have known that Franchisee Defendants, including through its employees and agents, was using the operation of the Defendants' Properties  to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2).  As alleged above, Franchisee Defendants engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). These violations happened within the scope of Franchisee Defendants' venture with Franchisor Defendants operating the Defendants' Properties.  Franchisor Defendants knew or should have known that Franchisee Defendants were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Franchisor Defendants are thus liable to Jane Doe as a beneficiary under 18 U.S.C §1595(a) because they knew or should have known that Franchisee Defendants were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) causing harm to Jane Doe when they continued participating in and financially benefiting from its relationship with Franchisee.

126.   Violations of 18 U.S.C §1595(a) by both Franchisor Defendants and Franchisee Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions of Franchisor Defendants and Franchisee Defendants alleged in this Complaint, to cause Jane Doe to

suffer substantial physical and psychological injuries and other damages as a result of being trafficked and sexually exploited at the Defendants' Properties

## III. Cause of Action: Franchisor Defendants' Vicarious Liability for Franchisee Defendants' Violations of the TVPRA (Actual Agency)

127.    Franchisee Defendants are the actual agent of Franchisor Defendants with respect to operation of the Defendants' Properties because, as described above, at all relevant times Franchisor Defendants exercised systemic control over Franchisee Defendants day-to-day operations of the Defendants' Properties, including the means and methods of operation.

128.    Franchisee Defendants are the actual agent of Franchisor Defendants with respect to operation of the Defendants' Properties because, as described above, at all relevant times Franchisor Defendants exercised systemic control over the aspects of Franchisee's operation of the Defendants' Properties that caused Jane Doe's injuries.

129.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent.

130.    In addition to its own direct liability, Franchisor Defendants are also vicariously liable to Jane Doe for the TVPRA violations of Franchisee Defendants, which are Franchisor Defendants actual agent.

131.    As alleged above, Franchisee Defendants are directly liable to Jane Doe for violations of the TVPRA, both as a perpetrators under 18 U.S.C §1591(a) and as a beneficiaries under 18 U.S.C §1595(a). Franchisor Defendants are vicariously liable to Jane Doe for those same violations.

IV.    **Cause of Action: Franchisor Defendants' Vicarious Liability for Franchisee Defendants' Violations of the TVPRA as Joint Employer of the Staff at the Defendants' Properties**

132.    At all relevant times, Franchisor Defendants and Franchisee Defendants were joint employers of the staff of the Defendants' Properties because they exercised joint control over the terms and conditions of employment and economic realities reflect joint employment.

133.    Under the TVPRA and the federal common law, Franchisor Defendants, as joint employer of the staff of the Defendants' Properties, are vicariously liable for the acts and omissions of the staff of the Defendants' Properties.

134.    As alleged above, the staff of the Defendants' Properties engaged in conduct that violated 18 U.S.C §1591(a) and §1595(a). Franchisor Defendants are vicariously liable for these TVPRA violations.

## DAMAGES

135.    Jane Doe AS seeks the following damages, joint and severally, from all Defendants:

    **a.**  Actual damages (until trial and in the future)

    **b.**  Direct damages (until trial and in the future)

    **c.**  Incidental and consequential damages (until trial and in the future)

    **d.**  Mental anguish and emotional distress damages (until trial and in the future)

    **e.**  Lost earnings and lost earning capacity (until trial and in the future)

    **f.**  Necessary medical expenses (until trail and in the future)

    **g.**  Life care expenses (until trial and in the future)

    **h.**  Physical pain and suffering (until trial and in the future)

    **i.**  Physical impairment (until trial and in the future)

**j.**  Unjust enrichment (until trial and in the future)

**k.**  Exemplary/Punitive damages.

**l.**  Attorneys' fees

**m.**  Costs of this action

**n.**  Pre-judgment and all other interest recoverable

**JURY DEMAND**

136.    Jane Doe AS requests trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Jane Doe AS prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe AS against all Defendants jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe AS may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**PROVOST★UMPHREY LAW FIRM, L.L.P.**

By: _/s/ Colin D. Moore_ _____

MATTHEW C. MATHENY | SBN 24039040
BRYAN O. BLEVINS | SBN 02487300
JACQUELINE RYALL | SBN 17469445
COLIN D. MOORE | SBN 24041513
350 Pine Street, Suite 1100
Beaumont, Texas 77701
(409) 835-6000
(409) 838-8888 Facsimile

mmatheny@provostumphrey.com
BBlevins@provostumphrey.com
jryall@provostumphrey.com
cmoore@provostumphrey.com

**ANNIE MCADAMS PC**

ANNIE MCADAMS | SBN 24051014
1150 Bissonnet, Houston Texas 77005
(713) 785-6262
(888) 713-0451 Facsimile
annie@mcadamspc.com

**SICO HOELSCHER HARRIS, LLP**

DAVID E. HARRIS | SBN 24049273
MORGAN A. MALOUF | SBN 24127767
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
dharris@shhlaw.com
mmalouf@shhlaw.com

**THE GALLAGHER LAW FIRM**
MICHAEL T. GALLAGHER | SBN 07586000
2905 Sackett Street, Houston, Texas 77098
(713) 222-8080
(713)222-0066 Facsimile
mike@gld-law.com
pamm@gld-law.com

**ATTORNEYS FOR PLAINTIFF**